No. 2014-1319

# United States Court of Appeals
# for the Federal Circuit

---

PATTI DONNER RUBIN,

*Plaintiff-Appellant,*

v.

SCOTTS COMPANY LLC,

*Defendant-Appellee.*

---

**Appeal from the United States District Court for the
District of Nevada in No. 2:09-cv-02419-GMN-VCF,
United States District Judge Gloria M. Navarro**

---

**BRIEF OF DEFENDANT-APPELLEE**

---

WILLIAM C. ROOKLIDGE
MICHELLE STOVER
JONES DAY
3161 Michelson Drive, Suite 800
Irvine, CA 92612
(949) 851-3939

JENNIFER L. SWIZE
JONES DAY
51 Louisiana Ave., N.W.
Washington, DC 20001
(202) 879-3939

Counsel for Defendant-Appellee
The Scotts Company LLC

## <u>CERTIFICATE OF INTEREST</u>

Counsel for appellee The Scotts Company LLC certifies the following:

1.     The full name of every party represented by counsel is:

The Scotts Company LLC

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by counsel is:

N/A

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

The Scotts Company LLC is a wholly owned subsidiary of the publicly traded company The Scotts Miracle-Gro Company.  The Scotts Miracle-Gro Company does not have any parent corporations, and no publicly held corporation directly or indirectly owns 10% or more of its stock.

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this Court are:

**Jones Day:**  William C. Rooklidge, Michelle Stover, Jennifer L. Swize, Thomas Demitrack, Jeffrey J. Jones, Douglas Cole (no longer with firm), Lester J. Savit (no longer with firm), Michael J. Stimson (no longer with firm).

**Snell & Wilmer LLP:**  Gregory A. Brower, Chad R. Fears, Brian R. Reeve.

**Glaser, Weil, Fink, Jacobs, Howard & Shapiro, LLP:**  Andrew Sedlock (no longer with firm).

.

# TABLE OF CONTENTS (continued)

CERTIFICATE OF INTEREST .................................................................i

TABLE OF AUTHORITIES ...................................................................iv

COUNTER-STATEMENT OF THE ISSUES ........................................1

COUNTER-STATEMENT OF FACTS ..................................................1

    A.    The Patent-in-Suit.........................................................................1

    B.    Scotts And Its EZ Seed Product ...................................................3

    C.    Rubin's Lawsuit ...........................................................................8

    D.    The Claimed "Volume-To-Volume Ratio" Of "7:1 To About10:1" ..8

    E.    The District Court's Claim Constructions....................................10

    F.    The District Court's Order Granting Summary Judgment Of No
        Infringement ..............................................................................12

SUMMARY OF ARGUMENT .............................................................18

STANDARD OF REVIEW ..................................................................19

ARGUMENT ......................................................................................20

I.     THE DISTRICT COURT'S CLAIM CONSTRUCTION WAS
      CORRECT ................................................................................20

    A.    The Court Correctly Construed "Volume-to-Volume Ratio" ............22

        1.    "Volume-to-Volume Ratio" Compares Volume Per
             Weight Before And After Compression .................................22

        2.    Rubin's Arguments Ignore The Intrinsic Record And
             Invoke Inapposite Extrinsic Evidence .................................23

    B.    The Court Correctly Construed "Ratio Ranging From 7:1 To
        About 10:1" ..............................................................................26

        1.    "About 10:1" Does Not Reach 13.5:1 ...................................26

        2.    "About 10:1" Does Not Refer To Burnishment ....................29

II.    BECAUSE EZ SEED DOES NOT MEET THE "7:1 TO ABOUT
      10:1" ELEMENT, THE DISTRICT COURT PROPERLY
      GRANTED SUMMARY JUDGMENT OF NO INFRINGEMENT..........32

CONCLUSION ...................................................................................39

## TABLE OF CONTENTS (continued)

**Page**

CERTIFICATE OF COMPLIANCE ........................................................................

CERTIFICATE OF SERVICE ...............................................................................

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)........................................................................19, 33, 37

*Becton Dickinson & Co. v. C.R. Bard, Inc.*,
922 F.2d 792 (Fed. Cir. 1990) .......................................................19, 32

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986).........................................................................19

*Cohesive Techs., Inc. v. Waters Corp.*,
543 F.3d 1351 (Fed. Cir. 2008) ....................................................27, 30

*Crown Operations Int'l, Ltd. v. Solutia Inc.*,
289 F.3d 1367 (Fed. Cir. 2002) ....................................................20, 38

*Cybor Corp. v. FAS Techs., Inc.*,
138 F.3d 1448 (Fed. Cir. 1998) (en banc) ...................................19

*Gen'l Elec. Co. v. Nintendo Co.*,
179 F.3d 1350 (Fed. Cir. 1999) ....................................................19

*Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.*,
540 F.3d 1337 (Fed. Cir. 2008) ....................................................30

*Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*,
381 F.3d 1111 (Fed. Cir. 2004) ....................................................21, 28

*Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*,
744 F.3d 1272 (Fed. Cir. 2014) (en banc) ...................................19

*Lund Indus., Inc. v. GO Indus., Inc.*,
938 F.2d 1273 (Fed. Cir. 1991) ....................................................35

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986).........................................................................38

# TABLE OF AUTHORITIES (Continued)

**Page(s)**

*Merrill v. Yeomans*,
94 U.S. 568 (1876) ........................................................................21

*Nobell, Inc. v. Sharper Image Corp.*,
950 F.2d 732, 22 U.S.P.Q.2d 1873 (Fed. Cir. 1991) .........................35

*Novartis Corp. v. Ben Venue Labs., Inc.*,
271 F.3d 1043 (Fed. Cir. 2001) ...............................................19, 32, 37

*Ortho-McNeil Pharm., Inc. v. Caraco Pharm. Labs., Ltd.*,
476 F.3d 1321 (Fed. Cir. 2007) ........................................................27

*Pall Corp. v. Micron Separations, Inc.*,
66 F.3d 1211 (Fed. Cir. 1995) ..........................................................27

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc) ............................21, 22, 25

*PSC Computer Prods., Inc. v. Foxconn Int'l, Inc.*,
355 F.3d 1353 (Fed. Cir. 2004) ........................................................29

*SkinMedica, Inc. v. Histogen, Inc.*,
727 F.3d 1187 (Fed. Cir. 2013) ........................................................19

*Southwall Techs., Inc. v. Cardinal IG Co.*,
54 F.3d 1570 (Fed. Cir. 1995) ..........................................................22

*SRI Int'l v. Matsushita Elec. Corp.*,
775 F.2d 1107 (Fed. Cir. 1985) (en banc) .......................................29

*White v. Dunbar*,
119 U.S. 47 (1886).............................................................................29

*Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*,
442 F.3d 1322 (Fed. Cir. 2006) ........................................................29

**STATUTES**

35 U.S.C. § 112 .....................................................................................21

# TABLE OF AUTHORITIES (Continued)

**Page(s)**

## OTHER AUTHORITIES

Fed. R. Civ. P. 56 ................................................................19, 37

*Merriam-Webster's Collegiate Dictionary* 241 (11th ed. 2004) ..............................4

*New Webster's Comprehensive Dictionary of the English Language* 133 (1985)..........................................................................16

## COUNTER-STATEMENT OF THE ISSUES

1.      Whether the district court correctly construed (a) "volume-to-volume ratio" and (b) "ratio ranging from 7:1 to about 10:1," where the court's constructions are consistent with the patent claims and written description, and Rubin's rejected constructions conflict with that evidence and rely on post hoc, result-oriented extrinsic evidence.

2.      Whether the district court correctly granted summary judgment where Rubin failed to present any evidence to overcome Scotts' proof that it compresses its coir to a ratio of at least 13.5:1, and therefore Scotts' coir falls outside the claimed range of "7:1 to about 10:1."

## COUNTER-STATEMENT OF FACTS

Based on a straightforward application of claim construction principles and relevant evidence put forth only by Scotts, the district court resolved this lawsuit on summary judgment on a single ground:  The accused growing medium is not compressed at the ratio claimed by the patent.  Rubin has shown no error in that resolution, which should be affirmed.

### A.      The Patent-in-Suit

Plaintiff-appellant Patti Donner Rubin owns the sole patent-in-suit, U.S. Patent No. 7,587,856, which issued on September 15, 2009.  The '856 patent, entitled "Compressed Growing Medium," is directed to a growing medium made in part by compressing a bulking agent and other materials such as fertilizers,

nutrients, and seeds. JA73; JA85 (1:39-42). A growing medium can be many different types of matter—essentially, "anything that a plant can grow in." JA472. Many are soilless or added to soil, providing additional nutrients, aeration, water holding capacity, or drainage that soil does not provide. JA481. According to the '856 patent, its contribution to this field is "a compressed growing medium with reduced seed germination" during storage and transportation, in order to avoid "excessively high mortality rates of the seedlings" that sprout before actually being planted. JA85 (1:22-35, 2:27-29).

The '856 patent states that the majority of the growing medium ("about 50% to about 98%") is "[a] hydrophilic fibrous bulking agent"—examples include "coir, peat, cotton, mineral wood, paper pulp, peat bark, birch bark, wool and/or hair." JA85 (2:48-53). Columns 3 through 4 of the patent explain that various other components may be added to the bulking agent, such as nutrients, water-retentive substances, fertilizers, insecticides, and seeds. JA86.

Accompanied by Figure 1, the '856 patent describes a compressed growing medium. It describes a bulking agent that is dehydrated, optionally compressed at a low ratio of 3:1 or less, and then mixed with other components, all of which are "then compressed." JA74 (Figure 1); JA86 (3:1-10, 4:51-67); JA89 (9:12-27). The compression ratio "rang[es] from about 7:1 to about 10:1 in order to provide a compressed growing medium suitable for packaging, shipment and sale." JA86

2

(4:63-65); JA89 (9:24-27).  The compression takes various shapes such as wafers, pellets, bricks, or slabs, which are packaged in "pouches, grow-bags, cans, canisters, jars, boxes, and other packages."  JA86-87 (4:67-5:12).  In an alternative embodiment, depicted in Figure 9, before packaging the compressed material is "reground in order to reduce the overall size of the growing medium in its compressed form," *i.e.*, the wafers, pellets, etc.  JA83 (Figure 9); JA88 (8:59-62).  Regrinding "simply breaks the compressed material into smaller sections of compressed material," providing the same claimed benefits as the growing medium not reground.  JA89 (9:55-59).  The claimed additional benefits of regrinding, based on the "smaller size of the reground material," are "increased flexibility in choosing a packaging container" and easier "distribut[ion]."  JA89 (10:34-41).

The '856 patent claims growing medium products and methods for making those products.  JA89-90 (the claims).  Claims 1 and 15 are the only independent claims; all of the other claims depend from either of those claims.  JA89-90.

## B.    Scotts And Its EZ Seed Product

The Scotts Company LLC ("Scotts"), an Ohio limited liability company, is a subsidiary of The Scotts Miracle-Gro Company, which has been in the horticulture industry for over a century.  Among Scotts' products is Turf Builder EZ Seed ("EZ Seed"), which it makes in Ohio.  EZ Seed is the only accused product in this case.

EZ Seed is a growing medium that contains coir, fertilizer, and Scotts'

3

trademarked high-performance seed; the combination works together when watered to absorb the water and expand, surrounding the seed in a nourishing, moist material that encourages strong, healthy roots even in challenging climates and keeps the seed from drying out, dying out, or being picked out by birds. *See* http://www.scotts.com/smg/gocat/turf-builder-ez-seed-products/cat70014. A two-pound jug of EZ Seed will treat 45 square feet of lawn, and a 40-pound bag will treat 420 square feet (roughly the equivalent of three parking spaces). *See id.*; http://www.scotts.com/smg/goART2/video/how-to-use-scotts-ez-seed-ultimate-winter-lawn-mix/17300008/1700005/21300003/7800016.

In 2011, Scotts obtained a patent that covers its process for making EZ Seed—U.S. Patent No. 8,024,890 ("the '890 patent"). JA742-52 (claiming priority to a 2007 provisional application). The '890 patent, which is not asserted in this lawsuit, includes claims to the ratio of expansion when the product is watered. JA751 (*e.g.*, claims 19 and 30).

The bulk of the EZ Seed product is coir (also called coir pith). JA755. Coir, brown in color, is a byproduct of processed coconuts—the "'stiff coarse fiber from the outer husk of a coconut.'" JA36 n.1 (quoting *Merriam-Webster's Collegiate Dictionary* 241 (11th ed. 2004)); JA21-22 (the parties' joint proposals, adopted by the court, that "coir" means "[c]oconut derived material including coir fibers and coir dust" and that "bulking agent" includes coir). As Scotts' '890 patent explains,

4

the long fibers of coir are used to make brushes, upholstery stuffing, and other products, while the short fibers and dust are generally treated as waste. JA747. Those leftover materials, however, have been recognized as "an excellent growing medium for plants," and are thus commonly used, as in EZ Seed, as a bulking agent. JA747; JA674; JA676; JA679-82; JA684-85; JA766-82 (articles describing coir's virtues for plant growth).

Scotts obtains its coir from third-party suppliers in India and Sri Lanka, where coconuts are prevalent and their leftover coir is available for purchase. JA755. When Scotts receives the coir from its overseas suppliers, the coir has already been compressed somewhat, to reduce the volume for transport. JA755. Depending on the amount of pressure the suppliers apply, the coir is formed into either "blocks" or "bricks." JA755. A "block" is compressed by a factor of approximately five (*i.e.*, 5:1 compared to pre-compressed, loose coir). JA755. A smaller, denser "brick" is compressed by a factor of approximately eight (*i.e.*, 8:1 compared to pre-compressed, loose coir). JA755.

To make EZ Seed upon receipt of the blocks and bricks, Scotts first "pre-condition[s]" the coir. JA746; JA755. Scotts shreds the bricks and blocks into smaller pieces using a shredder. Scotts also takes care, through "aspirat[ion]" (blown air), to remove extraneous materials from the coir (rocks, sand, etc.), resulting in "cleaned" coir. JA755. Scotts then "fine mill[s]" the shredded,

cleaned coir, which reduces the particle size.  JA755.

After pre-conditioning, the milled coir particles are mixed with "fines," which are small particles of previously compacted coir—these particles are too small to satisfy Scotts' specifications for its final product.  JA755-56.  Enough of the recycled fines are added so that approximately 50-60% of the coir material at this stage is made up of fines.  JA755-56.

Then, Scotts compresses the coir.  JA756.  Scotts feeds the coir material between two rolls of a roll compactor.  JA756.  The compactor uses a particular amount of hydraulic pressure to compress the material into a flat, continuous sheet that emerges from the roll compactor.  JA756.

After compression, Scotts mills and screens the compacted sheet—*i.e.*, Scotts breaks the sheet into smaller pieces, and accepts only flakes that are uniformly and optimally sized according to its specifications.  JA756.  To identify those pieces, Scotts uses two mesh screens—one with larger openings and one with smaller—sorting the flakes into ones that are "oversized," "undersized," and "on-size."  JA756.  The "oversized" flakes—those that do not pass through the mesh screen with the larger openings and therefore are too large for Scotts' final product—are further milled to reduce their size.  JA756.  The "undersized" flakes—"fines" that pass through the mesh screen with the smaller openings and therefore are too small for Scotts' final product—are set aside to be recycled into

new coir and re-compressed with that coir, as explained above.  JA756.  The

remaining flakes—particles that pass through the larger mesh screen but not the

smaller screen—are "on-size" and are mixed with seed and fertilizer or other

ingredients to create the final EZ Seed product.  JA756.

The block diagram in Figure 1 of Scotts' '890 patent, reproduced below,

depicts this process.  JA746; *see also* JA590 (annotating Figure 1).



Figure 1

### C.    Rubin's Lawsuit

In her complaint filed December 2009 and amended in September 2010, Rubin accused Scotts of infringing her '856 patent by making, using, selling, and offering for sale its EZ Seed product. JA91-96. It is undisputed that direct literal infringement is the only type of infringement Rubin has asserted. Rubin alleged that Scotts infringed both independent claims and certain dependent claims— product claims 2-3, 5, 9-10, and 12, which depend from claim 1, and method claims 16-20 and 22, which depend from claim 15.

In response, Scotts denied infringement and also alleged that the '856 patent is invalid on various grounds. JA154-71.

### D.    The Claimed "Volume-To-Volume Ratio" Of "7:1 To About 10:1"

A fundamental reason Scotts does not infringe concerns the second compression ratio required by all claims. Both independent claims recite two ratios: (1) "an initial ratio of less than 3:1" and (2) a later "ratio ranging from 7:1 to about 10:1." It is undisputed that both ratios are "volume-to-volume ratios," a term that is also recited in both independent claims.

Claim 1, the independent product claim, recites:

> 1. A reground growing medium, comprising:
>
> a bulking agent, wherein a particle size of said reground growing medium is less than 0.4 inches in mean diameter; and

wherein said growing medium is *compressed at a volume-to-volume ratio from an initial ratio of less than 3:1 to a ratio ranging from 7:1 to about 10:1* and then reground without reducing said volume to volume ratio to form an expanding soil mixture.

JA89 (emphasis added).

Claim 15, the independent method claim, similarly recites:

15. A method of making a growing medium to form an expanding soil mixture, comprising:

*compressing a dehydrated growing medium at a volume-to-volume ratio from an initial ration [sic] of less than 3:1 to a ratio ranging from 7:1 to about 10:1*; and

regrinding said compressed growing medium to a varying particle size of less than 0.4 inches in mean diameter.

JA90 (emphasis added).  Not mentioned, but undisputed, is the 1:1 ratio of the growing medium (or bulking agent) in raw form—it is essentially 1:1 because it has not been compressed.

With respect to the two recited ratios:  The "initial" ratio of less than 3:1 limits the amount of compression initially.  JA86 (3:1-10).  As the patent explains, "[i]f necessary, the bulking agent is also decompressed to a volume-to-volume ratio of about 3:1 or less."  JA86 (4:57-59); JA89 (9:18-20).  Then, the second ratio of "7:1 to about 10:1" requires compression to achieve that claimed range.  JA86 (4:57-65); JA89 (9:18-20, 9:24-27).  In other words, the transition from the initial ratio to the second ratio occurs as a result of "compressing" the growing medium from an initial ratio of less than 3:1 to the final, specified degree of 7:1 to about

10:1.  The district court and the parties have variously referred to this later compression as the final or "high compression" step.  JA28-31.  This second ratio is the only element at issue here.

Like the claims, the written description refers to these ratios.  JA86 (4:65); JA89 (9:26).  With respect to the maximum amount of compression—"about 10:1"—the written description discloses the importance of staying within that ratio. In discussing ways to recycle particles of previously compressed growing medium, the patent expresses concern with adding too many of those particles to the material to be compressed, resulting in over-compressing.  According to the patent, previously compressed particles may be recycled into new material, but in an amount no more than 10%.  JA88-89 (8:59-9:1 ("the re-introduced compressed growing medium can only be added . . . so long as the ratio of re-introduced material to virgin material does not exceed approximately 10:1")).  If more than 10% is re-introduced, compression "provides overly dense hard wafers as well as causing undue stress on the press[ing device]."  JA89 (9:1-4).  To address this concern, while still putting the previously compressed particles to use, the patent seeks to use and sell these particles as reground growing medium.  JA89.

## E.    The District Court's Claim Constructions

Although the parties agreed on constructions for twenty-one terms of the '856 patent, they disputed several other terms.  Among those were "volume-to-

volume ratio" and "ratio ranging from 7:1 to about 10:1," the two terms on appeal.
On November 8, 2011, the district court held a *Markman* hearing, and on
December 9, 2011, the court issued an order construing those terms and others.
JA17-35. The court adopted Rubin's proposals for some disputed terms and Scotts'
proposals for others, and it adopted the parties' joint proposals for the twenty-one
undisputed terms. JA17-35.

The two terms on appeal appear together in a larger clause. As shown in
representative claim 1, the growing medium is "compressed at a *volume-to-volume
ratio* from an initial ratio of less than 3:1 to a *ratio ranging from 7:1 to about 10:1*."
JA89 (10:59-61) (emphasis added). Claim 15 similarly requires "compressing a
dehydrated growing medium at a *volume-to-volume ratio* from an initial ratio[] of
less than 3:1 to a *ratio ranging from 7:1 to about 10:1*." JA90 (12:4-7) (emphasis
added). As the court observed, "[r]egardless of the exact wording, both
[independent] claims require a compression step where the final volume-to-volume
ratio is within the range of 7:1 to about 10:1." JA41 n.2.

The court construed "volume-to-volume ratio" to mean:

> the change in volume per weight of material (volume
> divided by weight) before compression as compared to
> the volume per weight of material after compression.
> The first number in the ratio is the volume per weight of
> the material prior to the high compression step. The
> second number in the ratio is the volume per weight after
> the high compression step.

11

JA31.  Relying on the surrounding claim language and the written description, the court concluded that "volume-to-volume ratio" refers to the volume per weight of the growing medium before and after compression.  JA30-31.  The court rejected Rubin's proposal that the ratio instead refers to the volume before and after the growing medium is exposed to water and expands.  JA30-31.

With respect to "ratio ranging from 7:1 to about 10:1," the court, consistent with its definition of "volume-to-volume ratio," concluded that the "ratio" constitutes a volume-to-volume ratio.  JA31.  Accordingly, the court construed "ratio ranging from 7:1 to about 10:1" to mean:

> the volume per weight of material (volume divided by weight) before compression is seven or more times the volume per weight of material after compression, but no more than about 10 times the volume per weight.

JA31.

### F.    The District Court's Order Granting Summary Judgment Of No Infringement

In March 2012, after the court construed the claims, Scotts moved for summary judgment of non-infringement on all of the asserted claims.  JA579-82; JA583-95; JA603; JA605-610; JA614-15.  As relevant here, Scotts explained that a straightforward, easily measurable difference disposes of Rubin's infringement allegations:  Rubin had no evidence that EZ Seed is compressed to a volume-to-volume ratio of "7:1 to about 10:1."  To the contrary, as Scotts' evidence showed,

12

Scotts' coir is compressed to a significantly greater degree—at least 13.5:1.

In support, Scotts submitted an affidavit by Marcus Bertin, one of the '890 inventors and a Scotts engineer. JA742; JA754-59. As Mr. Bertin explained, the coir that Scotts receives has already been compressed to a ratio of 5:1 (for blocks) and 8:1 (for bricks), and Scotts' further processing involves even more compression. As he explained, Scotts uses a high amount of previously compressed coir in its product, which it then compresses along with new coir to form a highly compacted sheet. To establish the volume-to-volume ratio, Mr. Bertin compared the density of Scotts' coir before and after compression (density being the inverse of specific volume, or volume per weight).[1]

To obtain the denominator in the ratio, the density of Scotts' loose coir before compression, Mr. Bertin relied on Scotts' records kept in the ordinary course of its business. Those records identified the density of the pre-compressed, loose coir, measured by Scotts on "representative samples of the [pre-compressed] materials"; the samples were provided by its suppliers. JA758. Those records showed the density of loose coir to be 0.064 to 0.078 grams per cubic centimeter (also written as g/cm$^3$). JA758; JA799-800. Mr. Bertin provided several secondary literature sources consistent with those measurements. JA757-58;

---

[1] Technically, Mr. Bertin compared the "bulk density" of the pre-compressed, loose coir and the "density" of the compacted coir. Because the parties use those terms synonymously (JA740), this brief uses simply "density" to describe both.

JA765-98.

To determine the numerator in the ratio, the density of Scotts' coir after compression, Mr. Bertin measured Scotts' compacted sheet. According to his measurements, the compacted coir had a density that ranged from 1.03 to 1.15 grams per cubic centimeter, at an average of 1.08 grams per cubic centimeter. JA757; JA761-64.

Mr. Bertin then calculated the ratio. Erring on the side of caution, Mr. Bertin rounded up Scotts' measurements of the loose coir samples (thereby reducing the ratio as much as possible), using a value of 0.08 grams per cubic centimeter. JA757. He then performed a simple mathematical equation to obtain a ratio that compares the density before and after compression:

$$\frac{1.08 \text{ grams per cubic centimeter}}{0.08 \text{ grams per cubic centimeter}} = 13.5:1$$

JA757-58.[2] If Mr. Bertin had used the actual value for Scotts' densest sample of loose coir (0.078 grams per cubic centimeter), the compression ratio would have been higher:

---

[2] Because the density that Mr. Bertin used (weight per volume) is merely the inverse of volume per weight, this equation is equivalent to dividing the pre-compression volume per weight (12.5 cubic centimeters per gram) by the post-compression volume per weight (0.926 cubic centimeters per gram), resulting in the same 13.5:1 value.

$$\frac{1.08 \text{ grams per cubic centimeter}}{0.078 \text{ grams per cubic centimeter}} = 13.8{:}1$$

And if Mr. Bertin had used the actual value for Scotts' least dense sample of loose coir (0.064 grams per cubic centimeter), the compression ratio would have been even higher:

$$\frac{1.08 \text{ grams per cubic centimeter}}{0.064 \text{ grams per cubic centimeter}} = 16.9{:}1$$

In other words, between the compression performed by the suppliers on the coir before it arrives to Scotts, and the further compression and processing by Scotts (including incorporation of previously compressed coir), Scotts' coir is compressed by a factor of at least 13.5:1 compared to loose coir, and likely more.

Scotts also pointed to Rubin's own understanding of the scope of her patent claims. JA592-93; JA609-10. In her deposition, Rubin testified that she intentionally limited the compression recited in her claims to a maximum of "about 10:1" because, in her view, that was the upper limit of "the best range." JA712. As she explained, her claimed invention "didn't expand if it was compressed too much" because over-compression slows or inhibits water compression. JA713. Rubin reiterated that she and her co-inventor avoided over-compression beyond a ratio of 10:1 because they "never saw it outside that [10:1] limit to work as well." JA713. Unlike in Rubin's experience, however, Scotts' highly compacted material

15

expands very effectively.  JA759; JA841-44.

In her brief opposing summary judgment, Rubin did not dispute any of the facts material to non-infringement.  JA845-57, JA863; *see also* JA912-23, JA929. Rubin did not provide any measurements or calculations of her own regarding Scotts' product, nor did she dispute any of Scotts' evidence or Mr. Bertin's calculations.  She did not dispute Scotts' evidence showing the density of the loose, pre-compressed coir that it receives, nor Mr. Bertin's calculations of the compacted sheet, nor his mathematical calculation comparing those two densities to obtain a volume-to-volume ratio of at least 13.5:1.

Instead, contending that coir measurements vary, Rubin relied on secondary sources—an article and Scotts' '890 patent—that mentioned different values for loose coir.  Rubin compared those generic values for loose coir to Scotts' compacted sheet, obtaining a ratio within the claimed range of 7:1 to about 10:1. JA853-54; JA872-78; JA901-11.  Rubin also argued that, even if Scotts' measurement of 13.5:1 is accepted, that ratio was "about 10:1" based on the word "about," and she submitted her own affidavit in which she alternately contended (in ¶ 3) that she meant "about 10:1" to include compression that does not result in burnishment—a term that never appears in the '856 patent.[3]  JA854-86; JA866-68.

---

[3] Burnishment describes a glazed exterior of a product.  *See New Webster's Comprehensive Dictionary of the English Language* 133 (1985) ("burnish" means

According to Rubin, either of these new constructions of "about 10:1" would cover Scotts' EZ Seed product and therefore summary judgment could not be granted.

On January 24, 2014, the district court granted summary judgment of non-infringement to Scotts.  JA36-45.  Whereas Scotts carried its burden, Rubin "lack[ed] any evidence of calculations based on measurements taken from the Accused Product or process that establishes a genuine issue as to whether Defendants' EZ Seed product is 'compressed at a volume-to-volume ratio from an initial ratio of less than 3:1 to a ratio ranging from 7:1 to about 10:1. . . .'"  JA43. The court also rejected Rubin's proposed new constructions of "about 10:1."[4] JA44-45.  Rubin's appeal followed.

---

(continued…)

"[t]o shine or buff" and "to make smooth").  According to Rubin, in her experience burnishment makes coir less likely to expand when it is watered.  JA867.

[4] Scotts also moved for partial summary judgment of non-infringement based on another term required by the product claims, and for partial summary judgment of invalidity of the method claims.  JA579-88.  In light of the court's finding of non-infringement on Scotts' first asserted basis, which disposed of all asserted claims, the court did not reach these other arguments.  JA40-41.  Scotts' invalidity counterclaims were subsequently dismissed without prejudice, and invalidity and the alternative basis for non-infringement are not before this Court.

# SUMMARY OF ARGUMENT

While Scotts' infringement defenses address several other missing elements of the asserted claims and numerous invalidity grounds, Rubin's lawsuit can be resolved, as the district court recognized, on a single, straightforward difference between the asserted claims and Scotts' EZ Seed product: EZ Seed is compressed well beyond the "about 10:1" maximum volume-to-volume ratio claimed in the '856 patent. In reaching this result, the district court correctly construed "volume-to-volume ratio" and "ratio ranging from 7:1 to about 10:1," the only two terms Rubin raises on appeal. Applying bedrock principles of claim construction, the court relied on the surrounding claim language and the written description, and properly rejected Rubin's proposed constructions that bear no resemblance to the claims and instead depend on extrinsic evidence improperly aimed to cover the accused product. And on the merits of Rubin's infringement allegations, the court further recognized that Scotts provided the only evidence in the case regarding the volume-to-volume ratio of its product—Rubin provided no relevant evidence, instead putting forth only secondary sources that have no bearing on the EZ Seed product she accused of infringement, or the loose coir from which it is made. With no evidence to create a genuine dispute, and all of the relevant evidence establishing that Scotts does not infringe, the court properly granted summary judgment of no infringement. The judgment should be affirmed.

## STANDARD OF REVIEW

Claim construction is a question of law reviewed *de novo*. *See Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*, 744 F.3d 1272, 1276-77 (Fed. Cir. 2014) (en banc); *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1451 (Fed. Cir. 1998) (en banc).

Summary judgment is also reviewed *de novo*. *See SkinMedica, Inc. v. Histogen, Inc.*, 727 F.3d 1187, 1194 (Fed. Cir. 2013) (citing Ninth Circuit law). Summary judgment is appropriate where there is no genuine issue of material fact. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Accordingly, infringement, although a question of fact, is appropriate for summary judgment where the evidence in the record does not raise any genuine disputes about material facts. *See Gen'l Elec. Co. v. Nintendo Co.*, 179 F.3d 1350, 1353 (Fed. Cir. 1999).

Where, as here, the party moving for summary judgment is the accused infringer, a burden-shifting scheme applies. *See Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 796 (Fed. Cir. 1990). The accused infringer "may meet its initial responsibility either by providing evidence that would preclude a finding of infringement, or by showing that the evidence on file fails to establish a material issue of fact essential to the patentee's case." *Novartis Corp. v. Ben Venue Labs., Inc.*, 271 F.3d 1043, 1046 (Fed. Cir. 2001); *see generally Celotex Corp. v. Catrett*,

19

477 U.S. 317, 325 (1986) (Where a party moves for summary judgment on "an issue on which the nonmoving party bears the burden of proof," the moving party may satisfy its initial burden as movant "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."). Once either showing is made, the burden shifts to the patentee to establish the existence of a genuine issue of material fact—*i.e.*, evidence by which a reasonable jury could reach a verdict in the non-movant's favor. In attempting to meet this burden, the patentee "cannot rest on mere allegations, but must present actual evidence." *Crown Operations Int'l, Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1375 (Fed. Cir. 2002). Put another way, to overcome summary judgment of non-infringement, the patentee must point to evidence in the record from which a jury could find infringement.

## ARGUMENT

### I. THE DISTRICT COURT'S CLAIM CONSTRUCTION WAS CORRECT

The district court correctly construed "volume-to-volume ratio" and "ratio ranging from 7:1 to about 10:1." To construe a claim term, a hierarchy of sources applies. The district court, in a reasoned opinion, faithfully followed this law. Rubin's proposals, which seek to cover a greater or different scope than what she claimed, do not.

Intrinsic evidence—the claims, the remainder of the specification, and the

prosecution history—is the most important evidence in construing a claim. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314, 1317 (Fed. Cir. 2005) (en banc). Of these, the principal source is the asserted claim itself—*i.e.*, "the context of the particular claim in which the disputed term appears." *Id.* at 1313. "[A] claim construction analysis must begin and remain centered on the claim language itself." *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004); *see also Phillips*, 415 F.3d at 1312 (quoting *Merrill v. Yeomans*, 94 U.S. 568, 570 (1876), for the proposition that the claims are "of primary importance, in the effort to ascertain precisely what it is that is patented"). Thus, "the context in which a term is used in the asserted claim can be highly instructive." *Phillips*, 415 F.3d at 1314.

Also instructive is the remainder of the patent specification, *i.e.*, the written description that precedes the claims. *Id.* at 1315. The written description and the claims share a "close kinship"—represented in "the statutory requirement that the specification describe the claimed invention in 'full, clear, concise, and exact terms.'" *Id.* at 1316 (quoting 35 U.S.C. § 112, ¶ 1 (now § 112(a))).

Extrinsic evidence, by contrast, is less valuable. As the Court has explained, "extrinsic evidence by definition is not part of the patent and does not have the specification's virtue of being created at the time of patent prosecution for the purpose of explaining the patent's scope and meaning." *Id.* at 1318. Indeed,

extrinsic evidence that "is generated at the time of and for the purpose of litigation" is particularly likely to "suffer from bias." *Id.* Moreover, "undue reliance on extrinsic evidence poses the risk that it will be used to change the meaning of claims in derogation of the 'indisputable public records consisting of the claims, the specification and the prosecution history,' thereby undermining the public notice function of patents." *Id.* at 1319 (quoting *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1578 (Fed. Cir. 1995)).

## A.    The Court Correctly Construed "Volume-to-Volume Ratio"

Applying these principles, the district court correctly construed "volume-to-volume ratio" as comparing the bulking agent's volume per weight before and after compression, rejecting Rubin's notion that the ratio compares volume before and after expansion due to hydration with water.

### 1.    "Volume-to-Volume Ratio" Compares Volume Per Weight Before And After Compression

Both the claim language and the written description compel the district court's construction of "volume-to-volume ratio" as measuring compression, not expansion due to hydration from water. The asserted claims require two actions—compressing and regrinding—to form an expanding soil mixture. JA89-90. "Volume-to-volume ratio" is recited *only* with respect to compression. Representative claim 1 recites that the growing medium is "*compressed at a volume-to-volume ratio* from an initial ratio of less than 3:1 to a ratio ranging from

22

7:1 to about 10." JA89 (10:59-61) (emphasis added). That same clause does not discuss expansion. Instead, expansion appears several clauses later—in the concluding phrase that the growing medium, after being compressed to the specified ratio, is intended "to form an expanding soil mixture." JA89 (10:62-63).

The written description likewise discusses "volume-to-volume ratio" only in the context of compression, not expansion. Each time the patent discusses ratios, whether "3:1 or less" or "7:1 to about 10:1," it does so in the context of "compression," without including any references to expansion or water. JA73 (Abstract); JA86 (4:57-65); JA89 (9:18-27). Indeed, the patent discusses expansion only generally. JA86 (3:3-8); JA88-89 (7:67-8:2, 8:29-32, 9:8-12; 9:57-59). The patent never identifies any particular amount of expansion that is intended, expected, or desired.

There is simply no support in the patent that the ratio concerns expansion. As the district court put it, "[w]henever the patentee discusses the volume-to-volume ratios of '3:1 or less' or '7:1 to about 10:1' the word compressed appears in the sentence but the word expanding or expansion is notably absent." JA30. "Rubin's proposed construction is not consistent with where the term 'volume-to-volume' appears" in the claims or written description. JA30.

## 2. Rubin's Arguments Ignore The Intrinsic Record And Invoke Inapposite Extrinsic Evidence

In challenging the court's construction of "volume-to-volume ratio," Rubin

first makes a run at the term "volume." (Rubin Op. Br. 10-11.) Disputing the court's description of the ratio as comparing volume per weight, Rubin argues that "volume" is a common term and thus should bear only its "plain and ordinary meaning." (*Id.* at 11.) But this improperly isolates "volume" from the remainder of the claim. The claim requires a "*volume-to-volume ratio*," not simply one "volume" of something.

The court included a weight reference to provide an objective, measurable baseline for the comparison and thereby ensure a usable, accurate ratio. Use of volume per weight, or its inverse, density, provides a basis for an apples-to-apples comparison. As Scotts explained in its claim construction briefing, a "volume-to-volume" comparison "has no meaning without a weight reference" to relate one volume calculation to the other. JA236.

Principally, however, Rubin repeats her mantra that "volume-to-volume ratio" refers to the extent of expansion due to hydration from water, not the extent of compression. (Rubin Op. Br. 11-13.) In doing so, Rubin entirely ignores the intrinsic evidence, invoked by the district court, making plain that the comparison of the growing medium is before and after compression, not expansion.

Instead, like her briefing before the district court, Rubin points only to extrinsic evidence, invoking references to "expansion ratios" in Scotts' '890 patent. (Rubin Op. Br. 12-13 (citing JA749).) Extrinsic evidence is of no use

24

when presented to vary the plain language of the claims. *See Phillips*, 415 F.3d at 1319 (extrinsic evidence cannot "be used to change the meaning of claims"). Yet that is precisely what Rubin's proposal would do: Her proposed construction contains numerous terms and elements that appear *nowhere* in the patent, much less in relation to the term "volume-to-volume ratio." (*See* Rubin Op. Br. 12 (citing only her own claim construction briefing and *Scotts' patent application* as support for her proposed construction).) Under Rubin's proposal, the expansion would occur as a result of "adding water" while "mixing by hand," and doing so with the aid of, *e.g.*, a "tongue depressor" and "a container (allowing drainage at the bottom)." (Rubin Op. Br. 12.) These steps and instruments are not even described in the patent. In fact, the patent's only references to water concern the unremarkable contemplation that an *end user* will water the claimed product. *E.g.*, JA88 (7:46-47) (the growing medium "allows a user to just add water"); JA88 (8:28-32) ("After depositing the wafers and pellets, water is added to the soil mixture," which "expands.").

As Scotts explained below, the references to "expansion ratios" in *Scotts'* patent have nothing to do with the scope of Rubin's claims. Scotts' patent claims recite those ratios; Rubin's patent claims do not. JA747-51 (2:49-53, 5:9-21, 8:3-4, 8:43-45, 8:65-9:14; claims 7, 19, and 30 (Scotts' patent describing and claiming "expansion ratio," and separately describing "compression ratio")). While Rubin

may wish she had framed her claims in terms of expansion ratios, she did not. The district court did not err in rejecting her proposed construction.

**B.    The Court Correctly Construed "Ratio Ranging From 7:1 To About 10:1"**

The court also correctly construed the term "ratio ranging from 7:1 to about 10:1," giving "about 10:1" its plain and ordinary meaning: "about 10 times." JA31. On summary judgment, the court properly rejected Rubin's proposals (she offered two) that "about 10:1" should be construed to include 13.5:1 or, alternatively, any compression that does not result in burnishment. JA44-45. According to Rubin, under either of her proposed constructions, the claims would encompass the volume-to-volume ratio of EZ Seed before and after compression. JA854-56. But as the court recognized, Rubin's proposed constructions are contrary to the claim language and written description, and no more than naked attempts to capture Scotts' product in her claims. JA44-45.

**1.    "About 10:1" Does Not Reach 13.5:1**

As with "volume-to-volume ratio," the surrounding claim language and written description preclude Rubin's argument that "about 10:1" can include 13.5:1. (*See* Rubin Op. Br. 15.) As the claims recite, the term "about 10:1" is part of a range: "7:1 to about 10:1." JA89 (10:61); JA90 (12:6-7). That range cannot possibly reach 13.5:1. If it did, the range would more than double. As the district court concluded, "such a drastic expansion of the term 'about' 10:1 would be

improper." JA45.

A range reaching 13.5:1 would also conflict with the written description.  It consistently refers to final ratios up to "about 10:1," without ever referencing any higher ratio.  JA73 (Abstract); JA85-86 (1:40-41, 1:44-45, 1:48-49, 4:63-65); JA89 (9:24-27).  Elsewhere in her brief, Rubin is forced to concede this fact, acknowledging that "the '856 Patent lacks any reference to any compression ratio that exceeds 10:1."  (Rubin Op. Br. 15.)

In nonetheless arguing that "7:1 to about 10:1" should include 13.5:1, Rubin leans heavily on the word "about," contending that cases construing "about" support her construction more than doubling the claimed range.  (Rubin Op. Br. 14-15.)  They do not.  As Rubin's cited cases make clear, the word "about" must be construed in context.  "'[T]he word 'about' does not have a universal meaning in patent claims, and [its] meaning depends on the technological facts of the particular case.'"  *Cohesive Techs., Inc. v. Waters Corp.*, 543 F.3d 1351, 1368-71 (Fed. Cir. 2008) (quoting *Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1217 (Fed. Cir. 1995), and construing "greater than about 30 microns" in light of the written description to include 25.434 to 34.566 based on particular variances disclosed in the patent); *Ortho-McNeil Pharm., Inc. v. Caraco Pharm. Labs., Ltd.*, 476 F.3d 1321, 1326-28 (Fed. Cir. 2007) (quoting *Pall* and construing "about 5:1" narrowly in light of the intrinsic and extrinsic evidence).  Here, the word "about" is

used in a relatively narrow range—a delta of three. "About" cannot be used to more than double that range. Moreover, construing "about" as a cushion of 3.5, so as to include 13.5:1, would also encompass "7:1" at the lower end of the range and render that term superfluous, contrary to the rule that "all claim terms are presumed to have meaning." *E.g.*, *Innova/Pure Water*, 381 F.3d at 1119 (rejecting construction that would render other terms "unnecessary and superfluous").

Further, the written description makes clear that the "about 10:1" high end of this narrow range was intentional. The patent expressly describes compressing to a volume-to-volume ratio of 7:1 to about 10:1 as intentional—"in order to provide a compressed growing medium suitable for packaging, shipment and sale." JA86 (4:63-67). The patent also expresses concern with overly compressed particles, stating that recycling a high amount of already compressed material into the material to be compressed will produce "overly dense hard wafers" and burden the press. JA89 (9:1-4). In her deposition, Rubin further expressed this concern and her intent to limit the ratio recited in her claims to a maximum of "about 10:1." As she explained, "about 10:1" was the upper limit of "the best range." JA712. In her experience, the material "didn't expand if it was compressed too much," and expansion did not "work as well" outside the 10:1 limit. JA713. All of this intrinsic and extrinsic evidence consistently compels the district court's conclusion that "7:1 to about 10:1" cannot be stretched to include 13.5:1.

In essence, in arguing that "about 10:1" should include 13.5:1, Rubin seeks a construction covering the accused EZ Seed product. This approach is anathema to the claim construction inquiry—it is black-letter law that claims must be "construed without reference to the accused device." *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1118 (Fed. Cir. 1985) (en banc) (emphasis omitted); *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1331 (Fed. Cir. 2006) (prohibiting "tailoring a claim construction to fit the dimensions of the accused product or process"). Rubin's proposal also fails to satisfy "the important public notice function of patents—the mechanism whereby the public learns which innovations are the subjects of the claimed invention, and which are in the public domain." *PSC Computer Prods., Inc. v. Foxconn Int'l, Inc.*, 355 F.3d 1353, 1361 (Fed. Cir. 2004). Under Rubin's interpretation, the "about 10:1" claim limitation would be the proverbial "nose of wax," *White v. Dunbar*, 119 U.S. 47, 51 (1886), conforming its meaning to the particular products at issue—and indeed, here, to only *some* of Scotts' product, given the samples showing compression to 13.8:1, 16:1, and beyond. JA757-58; JA761-64; JA799-800. For all of these reasons, the district court properly rejected Rubin's unsupported interpretation of "about."

## 2. "About 10:1" Does Not Refer To Burnishment

Rubin alternatively proposes that "about 10:1" should be construed to cover "any compression ratio where 'burnishment' did not occur." (Rubin Op. Br. 15.)

Rubin contends that this result was the intended purpose of her claims. But the '856 patent *never* refers to burnishment.

Rubin's sole support for an alleged "non-burnishment" purpose of her claims is post hoc extrinsic evidence that she created as a party to this litigation. (Rubin Op. Br. 4, 15 (citing her affidavit and deposition—JA867; JA712-13).) In a cursory, subjective affidavit submitted in opposition to summary judgment Rubin averred that "[i]t was [her] intention to cover all ranges 'about 10:1' that would not result in burnishment." JA867. Rubin stated that, "[b]ased on [her] experience, [she] discovered that if coir is compressed too much, it will become burnished and, as a result, will not expand effectively when exposed to water." JA867; *accord* JA712-14. Rubin's testimony was the entirety of her "evidence" on this point.

Rubin's testimony, "generated at the time of and for the purpose of litigation," is exactly the type of evidence that a district court may reject in its sound discretion. *See Phillips*, 415 F.3d at 1318. Indeed, this Court "hold[s] that inventor testimony as to the inventor's subjective intent is *irrelevant* to the issue of claim construction." *Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.*, 540 F.3d 1337, 1347 (Fed. Cir. 2008) (emphasis added). Although Rubin cites *Cohesive* for its inquiry into the purpose of a claim (Rubin Op. Br. 14), *Cohesive* looked to the specification for that meaning. *See* 543 F.3d at 1368; JA44. By contrast, given the complete silence of the intrinsic record here on burnishment,

Rubin can offer only her subjective intent.  The district court properly determined that Rubin's "post-hoc, self-serving statements" could not be credited to reinterpret the plain language of the patent as addressing burnishment.  JA44.

Besides, the patent already discloses a purpose of the 10:1 limit:  to prevent over-compression.  JA89 (9:1-4).  Rubin's "own testimony further confirms that she limited her claims to about 10:1 because wafers that had been compressed beyond 10:1 failed to expand adequately when exposed to water."  JA44.  On this record, the district court recognized that it would be improper to interpret the ratio as addressing burnishment and thereby "cover compression ratios that she had previously determined would not result in a functional product."  JA44.

Finally, whatever gain Rubin seeks in shifting the focus of her claims to burnishment, she cannot avoid summary judgment.  Even if the claims were construed to cover products where burnishment does not occur (regardless if the 7:1 to about 10:1 ratio is met), Rubin has no evidence that Scotts' process does not burnish the coir in EZ Seed.

Remarkably, that lack of evidence has not kept Rubin from baldly asserting in her brief that "burnishment has not occurred in the EZ Seed product." (Rubin Op. Br. 15.)  But there is no evidence in the record addressing whether or not the coir in EZ Seed has been burnished.  Notably, Rubin provides no evidentiary citation after her contention.  (*See* Rubin Op. Br. 15.)  Without any evidence,

Rubin failed to raise any genuine dispute of material fact on this issue.[5]  *See*

*Novartis Corp*, 271 F.3d at 1046 (summary judgment is proper if "the evidence on

file fails to establish a material issue of fact").

<div align="center">*   *   *</div>

The court correctly rejected Rubin's attempts to construe "volume-to-

volume ratio" and "about 10:1" contrary to the claim language and specification.

## II.   BECAUSE EZ SEED DOES NOT MEET THE "7:1 TO ABOUT 10:1" ELEMENT, THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT OF NO INFRINGEMENT

Applying its correct constructions of "compressed at a volume-to-volume

ratio . . . ranging from 7:1 to about 10:1," the district court properly concluded that

EZ Seed does not infringe as a matter of law because it is not compressed within

that ratio.  Rather, the evidence shows that Scotts compresses its product to a

significantly greater extent—by a factor of at least 13.5, and likely more.  And

because all of the asserted claims require the "7:1 to about 10:1" ratio, Rubin's

failure to establish this one element properly warranted summary resolution of all

of her claims.  *See Becton Dickinson*, 922 F.2d at 796 (to show direct literal

infringement, the patentee must show that every limitation in a claim is found in

the accused device exactly as set forth in the claim).  No reasonable jury could find

infringement.

---

[5] Rubin conclusorily asserts that, "[u]nder the proper construction, Scotts is not entitled to summary judgment" (Rubin Op. Br. 7), but fails to show why.

<div align="center">32</div>

The only evidence in the record measuring the compression of the coir used in EZ Seed was produced by Scotts. In moving for summary judgment, Scotts not only relied on the absence of any evidence from Rubin raising a genuine issue about Scotts' compression, but affirmatively provided evidence precluding a finding of infringement. Scotts presented measurements of the coir used in its EZ Seed product, before and after compression. Thus, Scotts provided measurements of the loose coir before it was somewhat compressed by its suppliers, and measurements of the compacted sheet after Scotts finished compressing the coir to its standards. JA757-58. As Mr. Bertin explained, "Scotts measured the bulk density of the representative precompressed (loose) coir samples provided by the suppliers," recording measurements "between 0.064 and 0.078 g/cm$^3$," and he measured the compacted sheet at an average of 1.08 g/cm$^3$. JA757-58 (explaining Exhibits 2 and 6); JA762-64 (Exhibit 2); JA799-801 (Exhibit 6). When compared, these measurements produce a volume-to-volume ratio of 13.8 to 16.9, in other words, the coir is condensed more than 13.5 times.

Rubin provided *no* contrary evidence. As the district court put it, Rubin's opposition "lack[ed] any evidence of calculations based on measurements taken from the Accused Product or process." JA43. Rubin thus failed to present any genuine issues as to the EZ Seed product and whether it infringes. *See Anderson*, 477 U.S. at 249 ("there is no issue for trial unless there is sufficient evidence

favoring the nonmoving party for a jury to return a verdict for that party").

On appeal, Rubin first seeks to overturn the judgment by contending that the district court improperly relied on secondary evidence in accepting the 13.5:1 compression ratio for Scotts' product. According to Rubin, the court held in Scotts' favor "based on an average taken from several publications." (Rubin Op. Br. 16; *accord id.* at 19 (similarly asserting that the court "accepted" Scotts' publications for the measurement of pre-compressed coir).) Not so. This is a mischaracterization of the court's opinion.

Scotts presented—and the district court adopted—measurements of the coir used in *EZ Seed*. Scotts' secondary sources merely corroborated its measurements of that coir. JA757-58 (Mr. Bertin's affidavit explaining that Scotts' measurements of pre-compressed coir are "consistent with the values reported in the public literature"). The district court acknowledged this: "Defendant explains that the initial density value used in these calculations [0.08 grams per cubic centimeter] is *consistent with* both the public literature on the subject and with Defendant's measurements of the starting coir received from its suppliers." JA42 (emphasis added).[6]

---

[6] Rubin also incorrectly asserts that Scotts and the court relied on "measurements of third party coir suppliers." (Rubin Op. Br. 17.) For one, the suppliers were those who supplied coir to Scotts, not suppliers generally or

Apparently, Rubin mischaracterizes the court's reliance on secondary materials in an attempt to bolster her own attempt to use secondary sources—although secondary sources are *all* that Rubin presents. (Rubin Op. Br. 19-20.) They cannot create a material dispute or overcome summary judgment. As the district court stated, "the only bulk density that is material to this case is the bulk density of the uncompressed coir that Defendant uses in the production of the Accused Product." JA43. Because Rubin's secondary sources do not address that coir, they are not material. *See Nobell, Inc. v. Sharper Image Corp.*, 950 F.2d 732, 22 U.S.P.Q.2d 1873, 1876 (Fed. Cir. 1991) ("A proper infringement analysis requires comparison of the accused device with the claims of the patent in suit, not with another device"); *Lund Indus., Inc. v. GO Indus., Inc.*, 938 F.2d 1273, 1275 (Fed. Cir. 1991) ("A proper infringement analysis requires comparison of the accused design to the patent claims, not to another design").

For instance, Rubin's cited article (Rubin Op. Br. 19) mentions coir with density around 0.15 grams per cubic centimeter, but "without tying" that measurement "to Defendant's product and process."[7] JA43. The measurements in

_____

(continued…)

unconnected to Scotts. JA758. For another, *Scotts* made the measurements, not the suppliers, doing so in the normal course of its business. JA758.

[7] Rubin attached this article to her opposition to summary judgment on April 6, 2012, well after the close of discovery on February 29, 2012. JA951. On April

Scotts' '890 patent are likewise inapposite. (Rubin Op. Br. 19.) Those measurements, which could have come from different coir (or been generalized, rounded, or misreported), say nothing about the coir that Scotts actually uses to make its EZ Seed and that it in fact measured. The court properly concluded that Rubin "failed to carry her burden of producing specific evidence that demonstrates the existence of a genuine dispute as to the compression ratio that results from the compression of the bulk coir that *Defendant uses* when producing the accused EZ Seed product." JA43 (emphasis in original).[8]

As a final argument against summary judgment, Rubin contends that Scotts' evidence was directed to the wrong step in Scotts' manufacturing process. She contends that the first number in the second ratio should measure the density of Scotts' coir after being cleaned in the "pre-conditioning" step, not the density of loose coir before Scotts' suppliers compress it into blocks and bricks. (Rubin Op. Br. 18-19.) Rubin argues that Scotts was required to present measurements of its cleaned coir before shifting the burden to Rubin or being entitled to summary

---

(continued…)

19, 2012, Scotts moved to strike the late-produced evidence. Because the article was irrelevant to the measurements of Scotts' coir and Rubin had no other evidence to overcome summary judgment, the district court denied Scotts' motion to strike as moot. JA43 n.4.

[8] Indeed, Rubin elsewhere agrees that the source of the coir being measured is critical. As she states, "the bulk density of uncompressed coir varies greatly on the make-up of the coir and the degree of settling of the coir." (Rubin Op. Br. 18.)

judgment.  (*Id.*)  This argument fails for two reasons.

*First*, Rubin, the party asserting infringement, failed to present *any* evidence measuring Scotts' coir, cleaned or not.  As the district court observed in rejecting this argument, Rubin "lacks any reference to specific evidence in the form of measurements from the production of [Scotts'] EZ Seed product."  JA42.  Accordingly, "the evidence on file fails to establish a material issue of fact" regarding the density of Scotts' cleaned coir.  *Novartis Corp*, 271 F.3d at 1046.

Rubin tries to turn the lack of any evidence on its head, asserting that "[t]here is no dispute that Scotts' 'cleaned' coir would yield a higher bulk density than the .08 g/cm$^{[3]}$" of Scotts' loose coir.  (Rubin Op. Br. 18.)  Rubin made a similar assertion in her summary judgment opposition.  JA853.  But there is no "dispute" on this issue only in the sense that there is no evidence on it.  That does not create a "genuine" dispute requiring trial.  *See* Fed. R. Civ. P. 56(a), (c) (only "genuine" disputes preclude summary judgment); *Anderson*, 477 U.S. at 249 (a dispute is not "genuine" "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party").  Again, a review of Rubin's brief confirms her lack of evidentiary support—she provides no citation, and merely asserts that the density would be "higher," identifying no specific value.  (*See* Rubin Op. Br. 18.)  How high?  Enough to yield a ratio within 7:1 to about 10:1?  Rubin cannot compel a trial by "simply show[ing] that there is some

metaphysical doubt as to the material facts"—Rubin must show that evidence in the record could lead a rational trier of fact to find in her favor, which she has failed to do.[9] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *see also Crown Operations*, 289 F.3d at 1375 (to overcome summary judgment, the patentee "cannot rest on mere allegations, but must present actual evidence" to create a genuine dispute).

*Second*, Rubin's argument, which is newly contrived on summary judgment, conflicts with the claim limitations. The claims require that the coir be "compressed at a volume-to-volume ratio *from* an initial ratio of less than 3:1 *to* a ratio ranging from 7:1 to about 10:1." JA89 (10:59-61) (emphasis added). As this language shows, "less than 3:1" and "7:1 to about 10:1" are two steps in the same continuum ("from . . . to . . .") and are compared directly to each other. In order to compare them, the "1" in "less than 3:1" and the "1" in "7:1 to about 10:1" need to be the same. Indeed, in her infringement contentions, Rubin used the density of

---

[9] Further, Rubin's supposition is logically baseless. When Scotts cleans the coir, it removes sand, rocks, and metal. JA607; JA755. As a matter of logic, removal of dense objects is unlikely to "yield a higher bulk density" than loose coir containing those objects. Alternatively, because low-density objects are also removed, cleaning could have no impact on density.

Besides, Scotts does not simply clean the coir; it also shreds the compacted blocks and bricks. JA607; JA755. With these various processes involved, there is no basis to make any assumptions about their effects on density, let alone Rubin's assumption.

pre-compressed, loose coir for the "1" in both ratios, asserting that the loose coir, before it was compressed by the suppliers to a ratio of 8:1 or 5:1, satisfied the "less than 3:1" ratio, and was compressed from that ratio to a ratio of "7:1 to about 10:1," again compared to the loose coir. JA622; JA627; JA633 (contending that "[t]he bricks of Sri Lankan origin are all compressed at a volume-to-volume ratio from an initial ratio of less than 3:1 to a ratio ranging from 7:1 to about 10:1").

But in opposition to summary judgment, and now on appeal, Rubin ignores the comparative value of "1" in the continuum "from . . . less than 3:1 . . . to . . . 7:1 to about 10:1," arguing that the "1" in "7:1 to 10:1" means a new value "*just prior to the high compression step.*" (Rubin Op. Br. 18 (emphasis added).) On top of not having any evidence of that value, Rubin is incorrect as a matter of the claim language. The claims do not change the value of "1" midway through the claim limitation. JA89 (10:59-61).

In short, Rubin is incorrect that the first number in the second ratio should measure Scotts' cleaned coir rather than loose, pre-compressed coir. But even if her equation were used, she presented no evidence of that value. Accordingly, no rational jury could find the "7:1 to about 10:1" limitation in the accused product. On that missing element alone, summary judgment was proper.

## CONCLUSION

The judgment should be affirmed.

Dated:  July 10, 2014                    Respectfully submitted,

                                         /S/ WILLIAM C. ROOKLIDGE

JENNIFER L. SWIZE                        WILLIAM C. ROOKLIDGE
JONES DAY                                MICHELLE STOVER
51 Louisiana Ave., N.W.                  JONES DAY
Washington, DC 20001-2113                3161 Michelson Drive, Suite 800
(202) 879-3939                           Irvine, CA 92612
                                         (949) 851-39393

          Counsel for Defendant-Appellee The Scotts Company LLC

## <u>CERTIFICATE OF COMPLIANCE</u>

1.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 9,015 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office 2007 in Times New Roman 14pt.

Dated:  July 10, 2014

/s/ Jennifer L. Swize
Jennifer L. Swize

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 10, 2014, the foregoing brief was filed on the

CM/ECF system, which constitutes service of the document on the following

principal attorney:

> John R. Posthumus, Esq.
> Sheridan Ross P.C.
> 1560 Broadway, Suite 1200
> Denver, CO 80202-5141
> *Counsel for Plaintiff-Appellant Patti Donner Rubin*

> /s/ Jennifer L. Swize
> Jennifer L. Swize